IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 21, 2018

## JOAN ELIZABETH HALL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lincoln County**
**No. S9600017      Forest A. Durard, Jr., Judge**

_____

### No. M2017-01621-CCA-R3-ECN

_____

Petitioner, Joan Elizabeth Hall, appeals the denial of her petition for a writ of error coram nobis based upon newly discovered evidence. After thoroughly reviewing the record and applicable authorities, we affirm the error coram nobis court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Jonathan C. Brown, Fayetteville, Tennessee, for the appellant, Joan Elizabeth Hall.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Robert James Carter, District Attorney General; and Edward Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Background*

Petitioner was convicted of criminal responsibility for first degree murder and was sentenced to life imprisonment. Her conviction was affirmed by this court on direct appeal. The facts of this case as set forth by this court on direct appeal are as follows:

> Stan Golden testified that he was traveling, on August 1, 1995, across Eldad Bridge at approximately 4:08 p.m. when he was flagged down by the Defendant. The Defendant told him that "they had shot her husband," and her husband was now laying in the river dead.

Danetta Marshall lived in the vicinity of the Eldad Bridge and was alerted by her next door neighbor, on August 1, 1995, that someone had been shot. When Marshall came outside, the Defendant was crawling up her driveway and eventually sat next to Marshall's car. Defendant screamed, "[T]hey shot my husband. They're going to kill me." Marshall's next door neighbor, Michael Key, then went inside Marshall's home to call 911.

Michael Key lived next door to Danetta Marshall. Key left work on August 1, 1995, at 3:30 p.m. and arrived home fifteen (15) to twenty (20) minutes later. While feeding his dogs, Key heard someone screaming for help, and he estimated the time he first heard the screams to be between 4:00 and 4:30 p.m.

Adrian Key, Michael's Key's son, was alerted by his brother of the situation. Adrian Key walked outside and found the Defendant screaming, "Don't let them get me. They shot my husband." Aron Key, Michael Key's older son, also observed the Defendant screaming between 4:00 and 4:30 p.m. that "they" killed her husband and were going to kill her.

Chad Robinson, the eighteen (18) year old stepson of Michael Key, drove to his home on the afternoon of August 1, 1995. When he got out of his car and started walking toward the house, he heard a gunshot. He went inside for five (5) or ten (10) minutes, then left again to go to an auto parts store nearby. Robinson spent ten (10) minutes driving to the store and approximately six (6) minutes inside the store, then returned home to find his brother and father sitting with the Defendant on the side of the road. Robinson estimated that the time between hearing the gunshot until he saw the Defendant to have been about twenty (20) or twenty-five (25) minutes. Robinson also recalled that Defendant used the word "they" when describing who had shot her husband.

Johnny Simmons, a deputy with the Lincoln County Sheriff's Department, received a call at 4:18 p.m. on August 1, 1995. Simmons went to the scene at Eldad Bridge, arriving at 5:10 p.m. as one of the first officers on the scene. Simmons observed the victim's body lying next to the river bank.

Andy Cline, the head of Crime Stoppers in Lincoln County, traveled to Eldad Road to videotape the crime scene on August 1, 1995. His video of the crime scene was shown to the jury.

Mac Kidd, paramedic with the Lincoln County Regional EMS, responded to a call at the Eldad River Bridge on August 1, 1995. The body of the victim had already been pulled from the river when he arrived on the scene. Kidd noted that the victim had a gunshot wound to the back of his head without an exit wound, blood coming from his left ear, and a possible entrance wound to the upper left quadrant of his body with a possible exit point in the lower right side of his abdomen. The body was transported to Lincoln Regional Hospital.

Mamie Ruth Hall, mother of the victim, testified that her son had two adopted daughters, one biological daughter and twin sons. He had been married to the Defendant for seven years on July 31, 1995. While the victim had been employed at Amana Refrigeration, he was laid off in July 1995. The Defendant's two daughters lived with the victim and the Defendant, and following the death of the Defendant's mother, the Defendant's biological son, Richard Romine, also came to live with them. A year prior to the victim's death, Richard Romine left to live with Michael Romine in Ohio. Mamie Hall explained that Michael Romine was the Defendant's older brother, and Richard was the Defendant's biological son who had been adopted by the Defendant's parents.

Mamie Hall stated that her relationship with the victim and the Defendant was good and they saw each other often. She described an incident during which the Defendant had threatened to kill her son, although she perceived that to be said "in jest." Hall often went fishing with the Defendant and the victim, and she had fished at the same spot where the shooting occurred just four (4) days prior to the shooting incident.

Following the victim's death and funeral, the Defendant told Hall that she did not know what happened. However, on the evening of the shooting, Hall overheard the Defendant tell her daughter that Richard Romine had shot the victim. Because she was suspicious, Hall hired Larry Shavers to independently investigate the murder. Their first meeting was on October 21, 1995.

Joyce McConnell, Investigator for the Lincoln County Sheriff's Department, answered a 911 call at 4:15 p.m. on August 1, 1995 by traveling to the Eldad River Bridge on Eldad Road. After she arrived, McConnell was directed to Danetta Marshall's home where she found the Defendant sitting on the front porch. McConnell described the Defendant as hysterical, crying and scared. Defendant stated that "they"

were going to get her, indicating that while she did not witness her husband's shooting, she believed more than one (1) person was involved as she overheard someone say, "[T]here she goes," when she attempted to flee the area. Defendant had left the spot where she and the victim were fishing to use the bathroom, and while she was finishing she heard her husband yell, "Run Joanie." While Defendant did not mention Richard Romine's presence at the time, she later told McConnell he had been with them while they were fishing, but she did not know where he was at the time of the shooting.

Defendant was advised to come by the Sheriff's Department. When she did, her *Miranda* rights were administered to her and a statement was taken. This statement was recorded and the tape was played to the jury. McConnell described that during the interview Defendant did not know who shot her husband. After leaving the area where they were fishing to go to the bathroom, she heard her husband yell, "Run Joanie," and then she heard shots. Defendant indicated that Richard Romine had been with them earlier, but they dropped him off at the intersection of Eldad Road and Liberty Road. In Defendant's handwritten supplement to her statement to police given on August 1, 1995, the Defendant included the following: "[A]nother time, Richard told my daughter that he would kill Olen by shooting him. I asked him how he would get away with it. He told me that he would blame it on me saying that I had him do it." Other investigation in which McConnell was involved included a search of the Defendant and the victim's home for weapons, but none of those found were determined to be the weapon used for the shooting. The Defendant was tested for gunshot residue, but the result was not positive.

McConnell stated that Richard Romine was charged with the murder of the victim on the evening of August 1, 1995. The investigation continued until February or March 1996. The Defendant and David Michael Romine were subsequently charged.

Kevin Duff, life insurance claims examiner for Principal Financial Group, testified that the Defendant was paid $84,692.38 in death benefits for a life insurance policy the victim had in effect at the time of his death.

Mike Hunter, investigator with the Lewisburg Police, also interviewed the Defendant who stated that she, Richard Romine and the victim had gone fishing. After she left the fishing scene to go to the bathroom, she heard her husband yell, "Run Joanie," and then heard one (1) or two (2) shots. After running back to find her husband, she saw him lying

facedown in the water. The Defendant described that the victim and Richard Romine had problems, with Richard threatening to kill the victim if given the chance. Richard had left their home to live with his brother Michael Romine in Ohio, but he returned to Tennessee in March 1995. Michael Romine eventually moved to the area, then Richard and Michael moved in together about one-half mile from the victim and the Defendant's home.

Richard Romine testified that although he was seventeen (17) years old at the time of trial, he was sixteen (16) on August 1, 1995. He learned at the age of twelve (12) that Defendant was his biological mother, though he had always known her as his adopted sister while he resided with his adopted mother and grandmother in North Carolina. After his adopted mother died, Richard went to live with the Defendant and the victim. Defendant's two daughters, Jenia and Mary Jane Latiolais, were also living there.

Initially, Richard admitted his first problems with the victim were when he found a mark on Jania's [sic] left leg after the victim had hit her with a belt. Also, there was a dispute over the television during which law enforcement officers came to the home and advised Richard to spend the night away from the Hall residence. Shortly after this incident Richard moved to Ohio to live with Michael Romine. After Richard and Michael moved back to Lincoln County, the Defendant found a mobile home for them to live in. Richard and the victim fished on a weekly basis, although never at the scene of the shooting.

Richard admitted that about two (2) or three (3) weeks prior to the murder, the Defendant discussed the problems she was having with the victim. She told Richard she wanted him to kill the victim because that was the only way to get rid of all the problems. Richard did not take her seriously until she produced a Derringer two-shot handgun. Defendant showed Richard how to operate the gun and then placed it back inside her purse. Four (4) or five (5) days later, the Defendant told him that if he were going to kill the victim, then it would have to be done prior to August 1, 1995, because the victim's insurance was running out on that date. A third conversation regarding killing the victim occurred a few days later, and it was then that Richard told the Defendant he would commit the murder.

Two (2) or three (3) days prior to August 1, 1995, Richard again talked with the Defendant while Michael Romine was present. The Defendant then offered to give him the victim's truck, $10,000.00, and to pay his

health insurance in return for his killing her husband. The plan was for Richard to shoot the Defendant in the leg while they were fishing so that it would appear to be a robbery. The Defendant then advised Richard that because the victim's employer had paid to renew his insurance policies and the policies would not lapse, there was no hurry to commit the murder prior to August 1, 1995. The day prior to the shooting, the plans changed slightly such that Richard was not supposed to be present at the time of the shooting, nor was he supposed to shoot the Defendant in the leg to make it look like a robbery. Michael Romine showed Richard how to load the handgun using real bullets, then the Defendant gave him four (4) hollow point bullets. Two (2) bullets were placed in the gun, with the remaining two left in Richard's pocket.

After their meeting, Richard began writing a contract for the Defendant to sign. He messed up the first version and threw it away in a shoe box. The second contract provided that Richard was "supposed to off Olen [victim]" with the Defendant to supply the gun, gloves, and alibi. Also, the Defendant was to give Richard $10,000.00, the victim's truck and pay his health insurance for two (2) years. He met the Defendant later that same day, but she refused to sign the contract. Richard stated that Defendant did agree with its contents. He also put this contract into the shoe box. A plan was made for Michael to pick him up after the shooting.

On August 1, 1995, after 2:30 p.m., the Defendant picked up Richard and he got the gun, gloves, and fishing gear. Richard put the gun in his pocket. When they went to the Defendant's residence, the victim was "being quiet." Richard told Defendant that the victim knew about their plan, but Defendant denied this. Richard claimed that the plan was for him to shoot the victim on the path leading to the river, but he could not get his gloves on so he went to the opposite side of the bridge from the victim. Defendant stated she had to go to the bathroom, and then Richard approached the victim from behind and shot him. After the victim fell into the water, Defendant came up behind him and was pointing at the victim so he shot him in the head. The gun was thrown into the river, and he fled the scene to be picked up by Michael.

Richard and Michael drove to Bi-Lo Supermarket to pay their telephone bill, and Richard told Michael that, "[H]e was shot. He was dead." After paying the phone bill, they drove to the Defendant's residence where Richard placed his gloves and his shoes in a barrel used for burning trash. Richard washed off and changed clothes, leaving his clothes in the laundry. They traveled towards Pulaski, then returned to

the Defendant's home to get her daughters. When they arrived, they "found out" about the victim's shooting so they went to the hospital. After leaving the hospital and going to Ruth Hall's home, law enforcement officers arrived and took Richard into custody.

On cross-examination, Richard admitted some inconsistencies in his testimony and confessions, including that he initially claimed his confession was not a true story. He recalled telling workers at the Middle Tennessee Mental Health Institute that he was "messed up in the head" and that you "have to be a little crazy to do what I did-commit murder." He also told investigators that Defendant had pulled the trigger, but admitted at trial that was a lie. Richard identified a letter which he wrote to the Defendant dated April 26, 1996, in which he indicated he "did wrong" and should have taken responsibility for his acts and never should have tried to "put it off on her."

Donna Pence, special agent with the TBI, was called in to investigate with McConnell in October 1995. She received some torn pieces of paper and a mug from Larry Shavers. Pence first interviewed Michael Romine on January 19, 1996, and she also participated in the interview of Natalie Romine on February 1, 1996. Notes were made from both these interviews, and the Defendant received copies of the notes from Michael Romine's interview.

Michael Romine testified that he is the biological uncle and adopted brother of Richard Romine. During the summer of 1994, Defendant contacted Michael to ask if Richard could come to live with him because Richard and the victim were having problems. Michael agreed, but in February 1995 he sent Richard back to Tennessee. Two (2) weeks later, Michael moved to Tennessee and he and Richard eventually moved into a trailer. The relationship between Defendant and her husband was tense to the point that during the summer of 1995, the Defendant told him that the victim needed to go. She described a plan she had devised for him to be shot while they were on a fishing trip.

Two (2) days later, the Defendant showed a .38 caliber weapon to Michael and offered him $10,000.00 and a truck. The shooting was supposed to occur that same day. Michael came to the river where the Defendant and the victim were fishing, but he was unable to pull the gun out. Afterwards, the Defendant said she was only "playing around" with Michael and knew he would not shoot her husband, but then stated that she was in the process of poisoning her husband by putting poison in the honey he used in his coffee. Michael recalled seeing the Defendant mix

something in the honey she added to Defendant's coffee. A week prior to August 1, 1995, the Defendant mentioned a double indemnity aspect of the insurance and asked Richard to shoot the victim. Three (3) or four (4) days later, the Defendant, Michael and Richard were again discussing shooting the victim. The Defendant told Richard that if he were caught he would only serve six (6) months incarceration in a juvenile facility and that she would provide his lawyer and an alibi. The plan was devised for Richard to shoot the victim, with Michael then picking up Richard, and the Defendant claiming that three (3) men tried to rob them.

On the evening prior to August 1, 1995, the Defendant stated that the shooting was to occur the next day. On the morning of August 1, 1995, the Defendant gave Michael $300.00 to pay his phone bill in order to provide an alibi for Richard. The Defendant picked up Richard at 2:45 p.m., then Michael went to her home at 3:00 p.m. to start a load of laundry. Michael then drove to Eldad Bridge, and when he arrived he saw Richard running towards the highway. Richard got into the back of Michael's vehicle, and they drove to Bi-Lo Supermarket to pay Michael's phone bill. The bill reflected it was paid at 3:43 p.m. on August 1, 1995. Then they drove back to the Defendant's residence where Richard took a shower while Michael started a fire in the trash barrel to burn Richard's shoes. Michael put Richard's clothes in the washing machine. Michael later found two (2) bullets in the washing machine which he threw in a woodshed, but he later retrieved the bullets and turned them over to personnel in the public defender's office.

In his initial statements to law enforcement officers, Michael admitted that he did not tell the "whole truth" in an effort to assist his brother Richard. He identified a contract found by Natalie Romine in Richard's room after the victim's funeral. It was placed behind a picture in Richard's room. He saw it again while he was in North Carolina when Natalie gave it to him torn into pieces. Following the indictment against him for criminal responsibility and accessory after the fact, he pled guilty to being an accessory with an agreement to serve a two (2) year sentence.

Louis Kuykendall, special agent forensic toxicologist with the TBI, testified that he tested the victim's coffee cup for Diazinon or Dursban, commonly known as insecticides. He found a brown residue on the cup. While the tests showed no basic or acidic drugs, it did test positively for cyanide in the residue.

Natalie Romine is married to James Frederick Romine, the Defendant's brother, and she had only met the Defendant on two (2) or three (3) occasions prior to the victim's death. After learning of the victim's death, she called the Defendant and was told that Richard had killed him. The Defendant asked Natalie to come for the funeral because she had no other family. Natalie agreed and flew to Huntsville, Alabama where she was picked up by the Defendant and her daughters. After arriving, the Defendant appeared to be "fine," but told Natalie that if it would have happened any later, she would not have received any insurance money. The Defendant advised Natalie that she would receive $250,000.00 from the victim's death. Defendant described the victim as the "meanest son of a bitch that ever lived." Defendant claimed that she was trying to protect Richard. After returning to the Defendant's home, the Defendant called the insurance company.

At the visitation prior to the victim's funeral, the Defendant gave various accounts of how her husband's shooting occurred, including that Richard had been smoking marijuana prior to killing the victim. Following the funeral, Defendant joked all the way to the cemetery, but adjusted her rearview mirror to prevent people in the car following them from seeing her amusement. After they returned to the funeral home, Defendant gave Natalie and Michael money so that they could get food and beer.

That same evening, Natalie found the contract at Michael and Richard's home. She stated that the document read, "I want ... $10,000.00, Olen's truck, two years' insurance. You supply me with weapon, alibi and gloves." While reading the document, Michael took it from Natalie and stuck it into his boot. Michael later returned it to her to read. The following day, they went to visit Richard who was being detained at the juvenile detention center. Richard tried to tell Natalie what had happened, but the Defendant warned him not to do so. That evening they all went drinking, and Natalie returned to North Carolina the following day.

Michael came to visit Natalie on two (2) or three (3) different occasions in North Carolina, and the Defendant moved there to live in a trailer on her brother's land. While Michael was there, Natalie overheard him tell the Defendant that she had better get a lawyer for Richard. Later, she heard Michael talking about how the Defendant tried to poison her husband, and the Defendant then implied to Natalie that "[i]t should have worked," in reference to her attempts to poison the victim. On another occasion, the Defendant admitted that she asked Michael to kill her husband.

While not present when the contract was torn into pieces, Natalie saw the contract on her kitchen table after it was torn into pieces by the Defendant. Natalie placed the pieces of the contract into an envelope which she placed in her bedroom, then later gave to Michael. Natalie recalled other conversations she had with the Defendant during which the Defendant advised her that she had Richard kill the victim.

Charles Harlan, forensic pathologist and medical examiner, performed the autopsy of the victim. The death was determined to have been caused by two (2) gunshot wounds to the head, chest and abdomen, with both shots being fatal. The first gunshot wound was a near gunshot wound to the back, with the muzzle of the gun being from six (6) to twelve (12) inches from the victim's body. The victim bled for somewhere between three (3) to ten (10) minutes from this wound. The gunshot to the victim's head caused him to cease being a viable organism immediately upon being shot, even though it would have taken several minutes for him to have died. Upon testing the victim's blood and urine, no basic drugs were detected. Harlan testified that "the cyanide test was not tested for by the laboratory." However, without further explanation, Harlan stated that there was no indication of the presence of cyanide during the autopsy because "if cyanide is present, I can detect it."

This evidence concluded the State's case-in-chief.

Jeff Bradford, investigator with the Lincoln County Sheriff's Department, testified that he participated in the investigation at the scene of the shooting and then later questioned the Defendant at the Sheriff's Department. He, along with the Defendant and Investigator Mike Hopson, went to the residence of Michael and Richard Romine where they searched the home. They found a shoe box in the bedroom containing drug paraphernalia, but no contract was found.

Jim Cranford, the brother of Ruth Hall, observed that the Defendant and the victim had an excellent marriage. During the funeral, he never observed any inappropriate behavior by the Defendant, and thought she appeared to truly mourn the death of her husband.

Palmeda Taylor, a licensed psychologist, evaluated Richard Romine and concluded that he was not mentally ill and was competent to stand trial. Richard admitted to her that, "You have to be a little crazy to do what I did, that is, commit murder." Two (2) weeks later, Richard retracted his

confession of killing the victim and named the Defendant as the murderer. She described his behavior as generally manipulative and superficially cooperative, having average intelligence and knowing right from wrong. Richard admitted to a poor frustration tolerance and poor anger control, stating that he "could not stand too many people. If I don't like them, I want to hit them." Dr. Taylor found Richard as having the potential for reacting with overt anger when he was upset.

*State v. Joan Elizabeth Hall*, No. 01C01-9710-CC-00503, 1999 WL 34782, at *1-8 (Tenn. Crim. App. Jan. 28, 1999).

Thereafter, Petitioner filed a timely petition for post-conviction relief that was denied by the post-conviction court, and this court affirmed the denial. *Joan Elizabeth Hall v. State*, Nol. M2000-02707-CCA-R3-PC, 2001 WL 1028819 (Tenn. Crim. App. Sept. 7, 2001). On February 8, 2016, Petitioner filed a *pro se* petition for writ of error coram nobis. Counsel was appointed, and the petition was amended to include a motion to correct an illegal sentence. Both the petition for writ or error coram nobis and the motion to correct an illegal sentence were denied by the error coram nobis court. The court specifically found that the petition for writ of error coram nobis was time-barred.

*Error Coram Nobis Hearing*

Petitioner's petition for writ of error coram nobis is based upon two letters purportedly written by her son and co-defendant, James Romine, in 2005. The first letter was typed and dated April 26, 2005, responding to an inquiry from the Tennessee Innocence Project. In the letter, Mr. Romine stated that he decided to kill the victim because the victim had been beating Mr. Romine's sister. Mr. Romine also stated in the letter that he killed the victim during a fishing trip when Petitioner went to use the restroom. He said that after his arrest, his brother, "David," later told him to talk to a private investigator who told him what to say. He closed the letter with the following statement: "All I want to do is fix things my mother should not be in prison for something I did and she never knew about it until it was to[o] late." The second letter was a handwritten, notarized letter purportedly written by Mr. Romine also stating that he killed the victim during a fishing trip and that Petitioner had "no idea of his actions until after th[e]y were accomplished." Mr. Romine stated that he had planned to also kill Petitioner but he did not have any bullets left after killing the victim. He said that he talked to a private investigator after his arrest who told him that he would receive less time if he said that Petitioner was involved in the murder. Mr. Romine also said that he lied about Petitioner's involvement in the murder to get revenge on her. The handwritten letter was signed and notarized on February 6, 2005.

At the error coram nobis hearing, Petitioner testified that she received the typed letter from the Tennessee Innocence Project in February 2011 along with a packet of papers. She said:

> They sent me a letter saying they were going through files because they were coming out of - - they were no longer in business, they could not afford it. And they were going through files and come through my file and said that represented - - just sent me a packet of papers and that letter was in that paper from my son to the Innocence Project.

When asked why she waited until 2016 to file the petition for writ of error coram nobis Petitioner replied:

> To tell you the truth, anything after I had my stroke, I had trouble remembering when I sent things out. But when I got everything together I was told that is what I needed to file and send in and that is what I did. That is when they told me about the Writ of Error, I didn't know there was another stage to go through.

The State objected to the typed letter as hearsay, and the error coram nobis court admitted it as an exhibit "for the restricted purpose of when she received that letter and when she might have been placed on notice when there might have been a problem in 2011, not for the truth of the matters contained in the letter because I think it is necessary to establish she waited from 2011 to 2016 to file anything in response to this letter."

Petitioner testified that at the time she received the typed letter, she and Mr. Romine did not have any other communication. She said that they communicated while he was still incarcerated "through the chapel" when he was in a special needs facility. Petitioner thought that he was sent there in 2009 for counseling. She also said that Mr. Romine had sent her a few letters in 2003 and 2004. Petitioner testified that she never discussed the letter with Mr. Romine, and she did not believe he knew that she had it. She said that she had communicated with Mr. Romine after receiving the letter "once before he got out in 2012 through the chapel, and then probably once when he was at my daughter's house, and when my brother passed away."

Petitioner testified that she placed the typed letter from Mr. Romine in her "legal papers." When asked if she researched any issues relating to the letter, Petitioner said: "No, sir, I didn't. I had filed the other letter that was notarized, and he told me it was an alleged letter and I could not use it. So I didn't figure that one would do any good." Petitioner testified that she was referring to a second notarized, handwritten letter purportedly written by Mr. Romine in 2005. The State also objected to the admission of the handwritten letter, and the error coram nobis court ruled that it could be used to establish a time line of when Petitioner received the letter but not for its content.

Petitioner was again asked why she waited five years to do anything with the letter from the Innocence Project, and she said:

> Well, like I said I didn't think it was worth anything. And I was going through it and somebody was talking about filing a Writ of Error Coram Nobis and told that is what I should file. I did not know that existed and had no idea what it was. I looked it up and found out it was something that had some grounds and I figured the letter did. So that is how I filed it. Why it took so long I never even heard of it until 2015.

Petitioner testified that she took immediate action when she learned about a petition for writ of error coram nobis.

On cross-examination, Petitioner testified that she had a stroke in 2009. She said that she received the handwritten letter from Mr. Romine in 2005. Petitioner testified that she then attempted to file it with the "Lincoln County Court" as a "clerical error." However, it was denied by the court. She said that she found out about filing a petition for writ of error coram nobis in 2014 or the beginning of 2015, and her petition was filed on "February 2nd or 3rd of 2016." Petitioner testified that she never discussed either the handwritten letter or the typed letter with Mr. Romine. She said that the Innocence Project got involved in her case because she asked them for help in 2004. She never sent them a copy of the handwritten letter. Petitioner testified that she never told any of her family members to make contact with the Innocence Project about her case; however, she said that the Innocence Project asked her for Mr. Romine's address and she gave it to them.

*Analysis*

Petitioner argues that she is entitled to due process tolling of the statute of limitations for her petition for writ of error coram nobis based on newly discovered evidence consisting of two letters written by her son and co-defendant Richard Romine stating that he killed the victim and that Petitioner had no knowledge of it.

A writ of error coram nobis is a very limited remedy which allows a petitioner the opportunity to present newly discovered evidence "which may have resulted in a different verdict if heard by the jury at trial." *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001); *see also State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999). The remedy is limited "to matters that were not and could not be litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas proceeding." T.C.A. § 40-26-105. Examples of newly discovered evidence include a victim's recanted testimony or physical evidence which casts doubts on the guilt of the Petitioner. *Workman*, 41 S.W.3d at 101; *State v. Ratliff*, 71 S.W.3d 291 (Tenn. Crim. App. 2001); *State v. Hart*, 911 S.W.2d 371 (Tenn. Crim. App. 1995). The supreme court

- 13 -

has stated the following concerning the standard to be applied when a trial court reviews a petition for writ of error coram nobis:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). Whether to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. *Id.* at 527-28. Summary dismissal, without discovery or an evidentiary hearing, is permissible when a petition for writ of error coram nobis is insufficient on its face. *Nunley v. State*, 552 S.W.3d 800, 826 (Tenn. 2018).

A petition for writ of error coram nobis must be dismissed as untimely filed unless filed within one (1) year of the date on which the petitioner's judgment of conviction became final in the trial court. *Mixon*, 983 S.W.2d at 670. The only exception to this is when due process requires a tolling of the statute of limitations. *Workman*, 41 S.W.3d at 103.

Petitioner does not dispute that her petition for writ of error coram nobis was not timely filed. In this case, Petitioner's motion for new trial was denied on May 23, 1997, and her petition for writ of error coram nobis was not filed until February 8, 2016, well outside of the limitations period. In addition to being untimely filed, the trial court also found that Petitioner had not alleged any grounds that would toll the statute of limitations. The error coram nobis court, citing *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010), concluded:

> This petitioner by her own admissions had knowledge of the recanted testimony by [Richard] Romine (exhibit 3) as early as 2005, some 11 years before the filing of her writ. Additionally, she had the information found in exhibit 1 some 5 years before the filing of her writ. Petitioner was anything but diligent and no testimony she provided formed a reasonable basis for excuse. Just as in *Harris* this petitioner was in entire control of the filing of her writ and there was nothing preventing her from doing the same. see *Harris*, 301 S.W.3d at 147. Due process considerations in this case do not warrant tolling of the statute of limitation[s] nor does it warrant taking additional proof.

We agree with error coram nobis court. Petitioner waited eleven years after receiving the handwritten letter and five years after receiving the typed letter before filing her petition for writ of error coram nobis. In *Harris v. State*, 301 S.W.3d 141 (Tenn. 2010 ), *overruled on other grounds by Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018), the supreme court declined to toll the statute of limitations because the petitioner waited too late between the discovery of the evidence and the filing of his error coram nobis petition. The petitioner in *Harris* had two pieces of evidence, which consisted of alibi evidence and third-party confession evidence, that he had discovered six years and twenty-one months, respectively, before filing his petition. Since nothing prevented petitioner from filing his petition earlier within that time period, the supreme court found the delay to be unreasonable under the circumstances. Therefore, petitioner was not entitled to due process tolling, and his petition was time-barred. *Id.* at 145-47; *see also Melissa Barnett v. State*, No. E2012-00855-CCA-R3-PC, 2013 WL 709588, at *5 (Tenn. Crim. App. Feb. 26, 2013)("Nothing in the record explains why the Petitioner waited over three years to attempt to present her coram nobis claim. The opportunity to assert her claim was within her control after she learned of her codefendant's guilty plea in late 2003 or early 2004, and nothing prevented her from seeking coram nobis relief while the motion to reopen was pending"); *Jerry Kevin Duke v. Sate*, No. M2014-01673-CCA-R3-ECN, 2015 WL 7566794, at *9 (Tenn. Crim. App. Nov. 23, 2015)("Under the facts presented in this case, the petitioner's almost sixteen-month delay in filing his claim based on the newly discovered DHS records was unreasonable").

Likewise in this case, there is nothing in the record to satisfactorily explain why Petitioner waited eleven years after receiving the handwritten letter and five years after receiving the typed letter before filing her petition for writ of error coram nobis. Although Petitioner said that she suffered a stroke in 2009, she did not allege that it affected the filing of her petition for writ of error coram nobis. Petitioner still had four years before her stroke to file her petition on the initial handwritten letter that she received in 2005. She also received the second letter two years after her stroke, and she waited an additional five years before filing her petition. Petitioner also indicated that she waited to file her petition because she was unaware that she could file a petition for writ of error coram nobis until 2015. However, this does not warrant tolling of the statute of limitations. *Melissa Barnett v. State*, No. E2014-02396-CCA-R3-ECN, 2015 WL 5601537, at *4 (Tenn. Crim. App. Sept. 23, 2015)("[I]gnorance as to the existence of a claim does not create a "later-arising" claim for due process purposes"); *Jacobs v. State*, No. M2009-02265-CCA-R3-PC, 2010 WL 3582493 (Tenn. Crim. App. Sept. 15, 2010)(In a post-conviction case, "lack of knowledge that a claim exists does not toll the statute of limitations").

Because the petition for writ of error coram nobis was untimely and tolling of the statute of limitations is not required, the error coram nobis court properly dismissed the petition. Additionally, because we have determined that the petition is time-barred, we

will not address the State's argument that Petitioner did not offer admissible evidence to support her error coram nobis claim.

## CONCLUSION

Accordingly, the judgment of the error coram nobis court is affirmed.

_____
THOMAS T. WOODALL, JUDGE